[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION de THE PLAINTIFF'S MOTION FOR MODIFICATION (#157)
The parties' marriage was dissolved on July 1, 1987. As part of said judgment the parties reported an oral agreement which the court accepted awarding sole custody of their one child to the defendant mother and awarding an elaborate visitation to the plaintiff father.
The plaintiff father has now moved to modify custody seeking to have sole custody awarded to him.
The custodial parent remarried in October, 1991 and has established a home with her present husband, Eugene Webb, including Mr. Webb's daughter, Laurie, 10 years old, and a new baby now seven (7) months old, in addition to the parties' son. Prior to her remarriage, she and the child lived with the maternal grandmother from the time of the dissolution of the marriage until her remarriage.
A custody study was assigned on April 10, 1992 and completed on October 15, 1992. It is admitted in evidence pursuant to Practice Book 479 as Plaintiff's Exhibit A. It recommends transfer of custody to the plaintiff father. The plaintiff called its author, Anthony C. Barbino, Family Relations Counselor, as his first witness who was subject to cross examination by the defendant.
The F.R.O. stated that he found the defendant to be very evasive regarding her relationship with her present husband and with his alleged drinking problem. The defendant did state that she might leave her present husband and return to her mother's home. During the FRO's investigation, the defendant was not cooperative in providing information. The defendant told the FRO that her present husband gets along well with the child and denied most of the plaintiff's allegations. CT Page 749
The defendant stated the plaintiff was inflexible in exercising visitation.
The F.R.O. report noted that the defendant no longer addresses the child by his first name but uses his middle name, Craig, and early on forced the plaintiff to use the name Craig. The child has expressed a desire to be continued to be called Edward. Unsolicited, the child volunteered that he would like to live with his father. The F.R.O. found the child to be very vocal, very bright, expressive, who does well in school.
The plaintiff described his proposed parenting plan to the F.R.O. as intending to move to his parents' home in Stratford. His parents are both retired and they have assisted their son in visitation, transportation and in accommodating the child for overnight visits.
The plaintiff is employed by the U.S. Postal Service as a letter carrier assigned to Naugatuck. He owns a condominium unit where he currently resides.
The court has concluded that the plaintiff's visitation schedule was frequently impaired by the defendant's conduct. On about one half dozen occasions the plaintiff enlisted the aid of the local police or counsel to obtain visitation. The child is entitled to the love and affection of both parents. The court has concluded that the defendant has not encouraged the child's visitations with his father and has attempted to attenuate the relationship by insisting upon using the child's middle name.
The plaintiff also engaged in tit-for-tat, e.g. Defendant's Exhibit #1 which was written to defendant by plaintiff asserting that, since defendant failed to provide a telephone number to plaintiff during her Florida trip, that plaintiff would not provide a telephone during his N.Y. state trip with his son.
It is a reasonable inference from the evidence that these parties are unable to talk to one another and must resort to writings and third parties. (cf. Defendant's Exhibit #3). The defendant did not advise nor invite the plaintiff to the boy's First Communion nor to a scouting award received in May, 1992 from the Bishop. Upon learning of the First Communion ceremony from his son, the plaintiff attended the church ceremony, sitting in the rear of the church. Again, this Christmas season, the boy had a band concert which the plaintiff learned about from his son, not CT Page 750 from the defendant. The child has called his step-sister the "step-sister from hell". His mother instructed him to discuss nothing about activities inside the Webb household. However, the child did confide in his father or in his maternal grandmother. He told his father that their calls were listened to on an extension. The child expressed that he was unhappy in the Webb house by typing such on the plaintiff's typewriter as well as saying so to his father. The boy once said he would rather be dead than to go back to his mother's house.
The defendant's present husband has not facilitated visitation, insisting that the pick up be on the dot of 4:30 p.m. On one occasion Mr. Webb slammed his front door in the paternal grandmother's face asserting it was only 4:25 p.m. although the boy was ready to leave.
The paternal grandmother is a registered nurse, and is available for babysitting as well as for transporting the child.
The defendant testified that the plaintiff sometimes arrived 30 minutes early for visitation thereby interfering with the boy's housework. This does not explain why the defendant required adherence to exactly 4:30 p.m. when the plaintiff or his mother arrived five minutes early as described above. Such rigidity could only create tension surrounding the visits.
The defendant acknowledged that the plaintiff has been diligent in exercising his visitation rights.
The parties' insistence on calling their boy by different first names has caused the boy embarrassment. The defendant claimed that she resorted to using the boy's middle name to avoid the confusion of "III" or "Jr.". She further claimed that the boy preferred Craig. The living arrangements of the defendant and the boy have changed substantially since 1987 and certainly upon the defendant's remarriage in October, 1991.
The boy expressed to his paternal grandfather a preference of living with his paternal grandmother. The boy further did, on some occasions, express a preference of living with his father and on other occasions of not living with his father.
The paternal grandmother testified that the boy's move to his new home in October 1991 confused the boy as to whether he would live with his mother or his father. CT Page 751
The maternal grandmother stated that Mr. Barbino F.R.O. refused to interview her but took Mrs. Mulrenan, the paternal grandmother, instead. The court heard the testimony of the defendant's mother and has concluded that, had she been interviewed, the recommendation of the F.R.O. would remain unchanged.
Mrs. Comerford, the maternal grandmother, assured the boy "he has a home with me anytime" when he brought up the issue of where he would be living.
Mrs. Comerford brought the boy to Dr. Cohn who recommended the boy be brought to Dr. Grant, a Psychologist. She brought the boy to Dr. Ruth Grant. After an upset in the courthouse when the boy did not want to return to his mother's home and said "I wish I was dead", the child was again brought to Dr. Grant. The court infers that the boy is troubled by his present living arrangements, which includes a new step-father, step-sister and a new baby sister.
Throughout the testimony of all the witnesses the boy was never once quoted as expressing a desire to stay in the status quo ante.
The father has made adequate housing arrangements with his parents. The defendant's present household is unsettled and the court infers that at times it is chaotic. Coupling this condition with the rigid approach to visitation time taken by the defendant and her present husband does not lend itself to the reduction of stress. The counsel for the minor recommended that the court accept the F.R.O. report. He further urged the court to note that the focus of the defendant is on her ex-husband rather than on the best interest of the child.
The court does not believe the defendant's contention that the boy is solely responsible for choosing to use Craig as his name.
Edward is a healthy bright child with diverse interests such as cub scouts, plays the trumpet in a band, and plays in little league. The defendant's present husband concedes that he is a good, decent boy.
The boy is doing well in school, now in 4th grade, as CT Page 752 evidenced by his report card (Defendant's Exhibit #6) promoting him from third to fourth grade, and his current report card (Defendant's Exhibit 7).
The court has found a material change in the circumstances of the custodial parent since the entry of the original custody order, Trunik v. Trunik, 179 Conn. 287. The court's paramount concern must be the best interests of the child, Connecticut General Statutes 46b-56; Hall v. Hall, 186 Conn. 118, and the court concludes it is in the best interest of this child that sole custody be transferred to his father. The mother is awarded reasonable visitation rights.
So ordered. The mother shall relinquish custody on January 15, 1993 to allow the transfer of clothing, personal effects of the boy to be accomplished over that weekend. The child support order is also terminated as of the 15th.
HARRIGAN, J.